FILED

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

03 MAR 18 PM 4: 08

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| LINDA P. RICHARDSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. CV 01-B-1441-S |
| | ) | |
| BLUE CROSS AND BLUE SHIELD | ) | |
| OF ALABAMA, | ) | |
| | ) | |
| Defendant. | ) | |

ENTERED

MAR 1 8 2003

## MEMORANDUM OPINION

Currently before the court is a Motion for Summary Judgment filed by defendant Blue Cross and Blue Shield of Alabama. (Doc. 36.) Plaintiff Linda Richardson filed suit against defendant alleging it had discriminated and retaliated against her on the basis of: 1) her race (African-American) in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act; 2) her age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* [ADEA]; and 3) her disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12102 *et seq.* [ADA]. She also claimed it had breached a contract with her and defrauded her in violation of Alabama common law. Upon consideration of the record, the submission of the parties, and the relevant law, the court is of the opinion that defendant's motion for summary judgment is due to be granted and plaintiff's claims are due to be dismissed.

5b

# I. **SUMMARY JUDGMENT STANDARD**

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met this burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in her favor. *See id.* at 255. Nevertheless, the non-moving party need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

2

## II. **FACTUAL SUMMARY**

### A. PLAINTIFF'S BACKGROUND WITH BLUE CROSS

Plaintiff, an African-American female, started working for defendant as Mail Clerk in March 1974; she was 25 years old at that time. (Doc. 37, Ex. 1 at 16, 52.) After three months, defendant promoted plaintiff to Claims Examiner. (*Id*. at 52). A few months later, defendant promoted her to Group Leader in the Claims Department. (*Id*. at 54-55). In 1991, defendant eliminated the Group Leader position and approximately 50 Group Leaders were terminated. *(Id*. at 57.) Plaintiff and other former Group Leaders that were retained by defendant were moved to the Training Department, and eventually, they took other positions with the company. (*Id*. at 56-57.) Plaintiff was on loan to the Subscriber Contract Administration Department for a year. (*Id*. at 57-58). In 1992, she transferred to that department as a full-time Benefits Analyst. (*Id*. at 58).

As a Benefits Analyst, plaintiff reviewed the coverage options selected by clients and wrote their insurance contracts. (*Id*. at 59). She also implemented the selected coverage in a database for claims processing. (*Id*.). Phillip Standridge (white male), was plaintiff's immediate supervisor, and David Bradley (white male) was the department manager. (*Id*. at 60, 237, 239.)

In the Fall of 1998, plaintiff became a Quality Assurance Analyst; in this position, she reviewed the Benefit Analysts' work before it was entered into the database. (*Id*. at 92.)

Around this time, Vivian Baguer[1] (white female) became plaintiff's immediate supervisor. (*Id.* at 63, 91, 237.)  Baguer evaluated plaintiff in 1999,[2] and she received an overall satisfactory score. (Pl. Depo. at 93-94 & Exh. 9.)

## B. DEFENDANT'S ATTENDANCE POLICIES

As Benefits Analyst and Quality Assurance Analyst, plaintiff was an exempt employee for wage and hour purposes.[3]  Prior to 1997, defendant had a general written policy for sick time absences for exempt employees, which stated:

> If you are an exempt employee, you do not earn sick leave.  Time off due to a [sic] illness is paid, and needs to be recorded as sick leave.  You are expected to work the necessary hours upon your return to complete your job responsibilities to the satisfaction of your manager.
>
> Exempt employees are cautioned against excessive time off from work [that] interferes with your job performance.

(Doc. 37, Ex. 4 ¶ 3 and ex. B.)  This policy was in defendant's Employee Handbook for at least ten years prior to 1997.  (*Id.* ¶ 3.)

In 1997, defendant adopted more specific guidelines for exempt employees, which provided that 110 hours of sick leave in a 12- month period is considered to be excessive.

---

[1]Vivian Baguer was formerly known as Vivian Baguer Charles.  (Doc. 37, Ex. 5.)

[2]Plaintiff asserted that Standridge actually completed her April 1999 evaluation and she took issue with the evaluation.  (Pl. Depo. at 63-64).  Defendant contends Baguer actually completed the initial 1999 evaluation.  Nevertheless, Baguer completed plaintiff's revised 1999 evaluation after she complained.  (*Id.* at 94-98).

[3]"The [Fair Labor Standards Act] exempts from its overtime pay requirements 'any employee employed in a bona fide executive, administrative, or professional capacity' who receives payment on a salary basis." *Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 965 (11th Cir. 1997) (quoting 29 U.S.C. § 213(a)(1)).

(*Id.* ¶ 2.)  In addition to time off for sick leave, exempt employees receive 80 hours of paid holiday time, and employees with more than 14 years of service, like plaintiff, receive 160 hours of paid vacation time.  (Doc. 37, Ex. 2 ¶ 3.)  Exempt employees are also eligible for several other types of leave of absences that are not included in the calculation of sick leave, such as leave under the Family and Medical Leave Act [FMLA] and extended medical leave. (*Id.*)

## C. PLAINTIFF'S ATTENDANCE

As of June 1999, plaintiff had used 140 hours of sick leave in the previous 12-month period.  (Doc. 37, Ex. 1 at 109, 172-173, and ex. 14.)  Baguer met with plaintiff and explained to her defendant's attendance policy for exempt employees.  (*Id.* at 109-11, 172-173 and ex. 14.)  She told plaintiff that her 140 hours of sick leave during the preceding 12 months was excessive according to defendant's policy.[4]  (*Id.* at 109, 172-173 and ex. 14; doc. 37, Ex. 5 ¶ 2.)

Baguer and plaintiff met again on September 21, 1999, to discuss plaintiff's attendance.  (Doc. 37, Ex. 1 at 112, 172-73, and ex. 14.)  Plaintiff had reduced her sick leave for the prior 12 months to 124 hours; however, her sick leave was still excessive and plaintiff continued to be absent from work for illness.  (*Id.* at 112, 172-73, and ex. 14.)  After this meeting, plaintiff's sick leave for the prior 12 months was reduced to 116 hours because 8

---

[4]When Baguer explained the sick policy to plaintiff, she erroneously thought the policy was 120 hours or more is considered to be excessive, as opposed to 110 hours.  (Doc. 37, Ex. 5 ¶ 2).  Under either standard, plaintiff's 140 hours of sick leave was excessive.

5

hours that had been documented as sick leave was corrected to reflect that plaintiff had used 8 hours of vacation time. (*Id.* at 112; doc. 37, Ex. 5 ¶ 2.) However, plaintiff still exceeded 110 hours of sick leave in the prior 12-month period. (Doc. 37, Ex. 5 ¶ 2.)

In late 1999,[5] plaintiff claims that she became sick and that her sickness was "stress."[6] (Doc. 37, Ex. 1 at 102.) In September 1999, Baguer told plaintiff that she might be eligible for FMLA leave. (Doc. 37, Ex. 5 ¶ 2.) Plaintiff initially applied for and was approved for medical leave in October 1999, but her mother and her psychiatrist advised her that she should continue working because she needed to keep interacting with people and being productive. (*Id.* ¶ 3; doc. 37, Ex. 1 at 113-14.)

## D. PLAINTIFF'S FAMILY AND MEDICAL LEAVE

Plaintiff began her FMLA leave, approved in October 1999, on December 1, 1999. (Doc. 37, Ex. 5 ¶ 3.) Plaintiff was on paid FMLA leave until she was released to return to work on February 7, 2000. (Doc. 37, Ex. 5 ¶ 3.) On February 7, 2000, plaintiff worked half a day. (Doc. 37, Ex. 4 ¶ 8.) She did not return to work until February 21, 2000, when she returned to work with a letter from her psychiatrist, which stated that she was limited to working half days for the next two weeks. (*Id.*; doc. 37, Ex. 1 at 115.) Plaintiff worked a few half days through March 7, 2002; however, she continued to be out many full days and

─────────────

[5]Plaintiff's sworn EEOC Charge states that she informed defendant she was disabled in 1993. (Doc. 37, Ex. 1, ex. 23.)

[6]Plaintiff claims that her stress was work-related. (Pl. Depo. at 102). Dr. Thweatt's notes and Dr. Hodges's deposition reveal otherwise. (Hodges Depo. at 13-14, 16-21; Heaton Aff. at ¶ 8 & Exh. E).

half days throughout the month of March without a doctor's excuse. (Doc. 37, Ex. 4 ¶ 8.) While plaintiff was working half days, she remained on intermittent FMLA leave. (*Id.*) These FMLA approved absences were not counted as sick leave. (*Id.*) On April 10, 2000, plaintiff was released by her psychiatrist to return to work without restriction. (*Id.*; doc. 37, Ex. 1 at 115.) Even though she was released to return to work without restriction, plaintiff continued to be absent and take paid sick leave. (Doc. 37, Ex. 1 at 115-16; Ex. 4 ¶ 8.)

In her 2000 performance evaluation, which was issued on April 27, 2000, Baguer noted that plaintiff had attendance problems. (Doc. 37, Ex. 1, ex. 10 at 3 ("Due to her ***attendance problems*** management is not able to assign special projects that involve an extended period of time and development to complete." (emphasis added)).)

From January 1, 2000, to June 26, 2000, plaintiff used 199 hours of sick leave, 371.1 hours of FMLA leave, 88 hours of vacation, and 24 hours of holiday time for a total of 628.1 hours, or 85 days, of paid leave out of approximately 125 work days. (Doc. 37, Ex. 3 ¶ 5). As of June 26, 2000, plaintiff had worked only 317.2 hours or 39.5 days. (*Id.*)

On June 29, 2000, Baguer met with plaintiff again to discuss her attendance and excessive sick leave. (Doc. 37, Ex. 1, at 172-73 and ex. 14.) In this meeting, Baguer told plaintiff that, beginning July 10, 2000, plaintiff would be subject to disciplinary action for any time off for illness in excess of one day per month. (*Id.*) Plaintiff responded by asking Baguer to terminate her employment. (Doc. 37, Ex. 5 ¶ 3.) Baguer encouraged plaintiff to talk to Jan Deagon, Employee Relations Manager, and reminded plaintiff of her options of

7

taking paid and unpaid medical leave or pursuing long-term disability if she were unable to work. (*Id.*)

Plaintiff met with Deagon on June 29, 2000, to discuss her attendance problems. (Doc. 37, Ex. 3 ¶ 6.)  During the meeting, plaintiff told Deagon that she was not going to be able to make it with the attendance guidelines. (*Id.*)  Deagon explained to plaintiff that she had a number of options she should explore, such as seeking long term disability (LTD) benefits and medical leave. (*Id.*)  Deagon advised her to talk to defendant's employees that administered those plans – Doris Goodwin and Amy Gillis. (*Id.*)

Plaintiff told Deagon that she did not want medical leave or LTD benefits because she was concerned about money. (*Id.*)  Deagon told plaintiff that if there was a time period she would be without pay, defendant might be able to make an exception and pay her until she received LTD benefits, a "bridge payment." (*Id.*).  Plaintiff told Deagon that she suffered from depression and anxiety and that some mornings she could not get out of bed. (*Id.*)  Plaintiff told Deagon that she was continuing to work with her doctor on adjusting her medication but the medication did not seem to help, and that she must face the fact that she might never get better. (*Id.*)

Plaintiff had exhausted all of her paid leave time but Deagon and Deagon's managers, Rick King and Vickie Saxon, agreed to make an exception for her and to give her a full 90-day paid medical leave for which plaintiff was not qualified to help bridge her while she pursued LTD benefits. (*Id.*)

Plaintiff and Deagon talked again in July 2000, and Deagon told plaintiff about the 90-day bridge payment, as well as other leave options. (*Id.* ¶ 7.) Plaintiff, via an e-mail, asked that Deagon put their discussion in writing by July 14, 2000. (*Id.* ¶ 7 and ex. B.) Deagon responded to plaintiff and gave to her, in writing, the options they had discussed. (*Id.*¶ 7 and ex. C.) These options included: (1) 90 days of paid medical leave, including benefits normally provided by defendant and her position held open for 25 days; (2) 90 days of unpaid extended medical leave; and (3) extended leave of up to 12 months (unpaid), with 30 days to bid on a position upon return. (*Id.*)

Plaintiff discussed these options with Clarence Brown, a friend, and with her attorney. (Doc. 37, Ex. 1 at 157-159, 221.) After considering these options, plaintiff informed Deagon that she was not interested in utilizing any of these leave options. (*Id.* at 160-161; doc. 37, Ex. 3 ¶ 8.)

By August 2000, plaintiff had exhausted all of her vacation time; she would not be eligible for additional vacation time until March 7, 2001, her anniversary date. (Doc. 37, Ex. 5 ¶ 6.) From September 1, 1999, through September 5, 2000, plaintiff was reported off from work for sickness a total of 223 hours of sick leave, not including her FMLA leave, vacation, or holidays.[7] (*Id.* ¶ 7.) Plaintiff called in sick September 6-8, 2000. (*Id.*) Thereafter, Baguer met with plaintiff on September 11, 2000, to discuss disciplinary action against her because she had exceeded her limit of one sick day per month. (*Id.*)  At this time, Baguer told

---

[7]Plaintiff worked only 1,008.8 hours from September 27, 1999, to September 27, 2000. (*See* doc. 37, Ex. 1, ex. 20.)

plaintiff that, if she exceeded one sick day per month, she would be terminated. (*Id.*; doc. 37, Ex. 1 at 130 and ex. 14.)

On September 13, 2000, Dr. Rodney Dennis, plaintiff's urologist, submitted a note to defendant, which indicated that plaintiff was having a bladder problem and that he had scheduled her for outpatient surgery on September 15, 2000. (Doc. 37, Ex. 5 ¶ 8.) Dr. Dennis performed outpatient surgery on September 15, 2000, (doc. 37, Ex. 1 at 178-79), and plaintiff's absence on that day did not count against her for disciplinary purposes, (*id.*; doc. 37, Ex. 5 ¶ 8.) After plaintiff was absent on September 15, 2000, Baguer, again, offered her the same leave options previously extended to her. (Doc. 37, Ex. 5 ¶ 8.) Baguer made the same assurance that, if plaintiff wanted to pursue long-term disability and if there was a time plaintiff was without pay, defendant would attempt to bridge the gap until she started receiving disability. (*Id.*) Again, plaintiff rejected these options. (*Id.*)

On October 4, 2000, plaintiff called in sick, and Baguer told plaintiff that her employment would be terminated if she was absent again in October. (*Id.* ¶ 9) Plaintiff was absent on October 24, 2000. (*Id.*) From October 24, 1999 to October 24, 2000, plaintiff had taken 251 hours of sick leave. (*Id.*) During this time period, plaintiff had worked only 1,025.2 hours and had been absent 1,054.1 hours.[8] (*Id.*).

_____

[8]Baguer, at this time, again checked on the possibility of an FMLA leave, (doc. 37, Ex. 5 ¶ 9), but plaintiff was not eligible for FMLA leave because she had not worked the requisite 1,250 hours in the preceding year, (*id.*; *see also* 29 U.S.C. § 2611 (2)(A)).

10

Because plaintiff missed two days in October in violation of the September written warning and because her hours of sick leave exceeded 110 in the last 12-month period, Baguer recommended that defendant terminate plaintiff. (*Id.* ¶ 10.) Baguer's recommendation was approved by her managers and by Human Resources. (*Id.*) Defendant terminated plaintiff effective November 10, 2000. (*Id.*)

Plaintiff's former supervisor, Phil Standridge, was not involved in the decision to terminate plaintiff's employment. (*Id.*)

## E. EEOC CHARGE

On February 20, 2001, plaintiff filed a Charge of Discrimination with the EEOC. (Doc. 37, Ex. 1, ex. 23.) Plaintiff alleged that she had been discriminated against on the basis of her race, age, and disability, and that defendant had retaliated against her. (*Id.*) She claims that such discrimination occurred on November 10, 2000, the date of her termination. (*Id.*)

In her Charge, plaintiff claimed that she had started having problems with Standridge in 1993. (*Id.*) She alleged that Standridge was critical about her job performance and that he was told or informed about her job performance even after Baguer became plaintiff's supervisor. (*Id.*) Plaintiff also alleged:

> Between September 13, 2000 and November 10, 2000, I had surgery twice. I received a written warning for attendance on or about September 27, 2000, which [was] the first warning/disciplinary action I ever received during my tenure of employment. The written warning stated that I could not miss more than one (1) day per month due to being sick until March 2001. I was discharged on November 10, 2000.

11

[Baguer] told me that I was being discharged because I had used to [sic] many sick hours within the last twelve months.

I believe that I was discharged and discriminated against because of my race, Black, my age, 52 (DOB 6-15-48), and my disability, and in retaliation for having opposed practices made unlawful under Title VII . . ., the Age Discrimination in Employment Act . . ., and the Americans with Disabili[ties] Act of 1990 . . . .

(*Id.*)[9]  Plaintiff timely filed a Complaint, alleging discrimination on the basis of her race, age, disability, retaliation, breach of contract, and fraud.

## III. DISCUSSION

## A. DISCRIMINATION CLAIMS

Plaintiff contends defendant discriminated against her on the basis of her race, age, and disability by denying her promotions, by adversely affecting the terms and conditions of her employment, by allowing a hostile environment to exist, and by terminating her employment.  For the reasons set forth below, defendant's Motion for Summary Judgment will be granted as to all of plaintiff's discrimination claims.

### 1. Promotion Claims

Defendant contends that plaintiff's promotion claims are time-barred.  Plaintiff filed her Complaint on June 6, 2001; she filed her EEOC charge on February 20, 2001.  Therefore, any promotion decision made before June 6, 1999, is barred by the statute of limitations for

---

[9]Plaintiff requested a Notice of Right to Sue, and it was issued on March 8, 2001.

§ 1981 claims,[10] and any promotion decision made before August 24, 2000, is barred by the statute of limitations for Title VII, ADA, and ADEA claims.[11]

Plaintiff alleges that she was not considered for "numerous positions that she had bid on while employed by defendant." Pl.'s Brief at 10. However, she identifies only one position for which she sought promotion within the statute of limitations period. (*Id.* at 10-11). She contends that she applied for a promotion in 2000 for a position in the training department; she contends that defendant selected Derrick Lockhart, a younger black male.

The court notes that defendant has presented evidence that the Lockhart promotion decision actually occurred in October 1997, and this position was the last position for which plaintiff applied. (Doc. 37, Ex. 4 ¶ 7 and ex. D.) Plaintiff has not offered any evidence to rebut this showing, other than her deposition testimony, which is not definite as to the date of the promotion decision.[12] The court finds that plaintiff has failed to rebut defendant's showing that the decision to promote Lockhart was made in 1997 and, thus, plaintiff's age discrimination claims based on this promotion decision is time-barred.

_____

[10]*Peterson v. BMI Refractories*, 132 F.3d 1405, 1414 n. 16 (11th Cir. 1998) (holding that the statute of limitations for a claim under 42 U.S.C. § 1981 is two years).

[11]*See* 42 U.S.C. § 2000e(5)(f) (EEOC Charge alleging race discrimination must be filed within 180 days after the alleged unlawful conduct); 42 U.S.C. § 12117(a) (The powers, remedies, and procedures . . . set forth in sections . . . 2000e-5 shall be the . . . remedies, and procedures this subchapter provides to . . . any person alleging discrimination on the basis of disability . . . ."); 29 U.S.C. § 626(d)(1)(EEOC Charge alleging age discrimination must be filed "within 180 days after the alleged unlawful practice occurred.").

[12]When asked when she bid on the job that "Derrick" received, plaintiff testified, "I believe it was in 2000. I am not sure." (Doc. 37, Ex. 1 at 146.)

Defendant's motion for summary judgment as to plaintiff's promotion claims will be granted and such claims dismissed.

## 2.    "Terms and Conditions" Claims

In her brief, plaintiff alleges five incidents[13] of disparate treatment, which she contends constitute actionable discrimination:

[1]    [Plaintiff] was given three hundred and fifty contracts to handle when white employees in the department only had a hundred and fifty to ninety. [(Doc. 37, Ex. 1 at 206-07, 212.)] Mrs. Richardson spoke with David Bradley and Phillip Standridge regarding the discrepancy in the number of contracts she had to handle versus the number of contracts white employees handled. *Id.* at 208.[14]

[2]    Even though Ms. [Baguer] became Mrs. Richardson's supervisor in 1998, everything that Mrs. Richardson did had to go through Mr. Standridge according to Ms. [Baguer]. *Id.* at 103

[3]    The evaluation she signed [in] June of 1999 in which she received a 72 was the second evaluation that was done for that year. *Id.* at 93. The first evaluation (in which Mrs. Richardson's score was in the sixties) was actually completed by Mr. Standridge, who at that time was not her manager/supervisor, and she went to human resources to complain about it and the treatment she had received from Mr. Standridge. *Id.* at 94-96.[15]

_____

[13]Plaintiff actually sets forth six instances. (Pl.'s Br. at 13.) However, the first instance – "Mr. Standridge treated her differently from any of the white people in the subscriber contract department" – is too conclusory to support a claim for disparate treatment.

[14]This incident occurred before Baguer became plaintiff's supervisor in 1998. (Doc. 37, Ex. 1 at 91-92, 207-08.)

[15]Plaintiff testified that she believed she received the first evaluation in May 1999. (Doc. 37, Ex. 1 at 95.)

14

[4]     Mrs. Richardson testified that she was asked by David Bradley to leave the department just as Mr. Standridge had told her he wanted her out of his department. *Id*. at 201-02.[16]

[5]     Mr. Standridge told Mrs. Richardson that she would have to take a non-exempt job because she did not have a college degree and that she was going to have to be demoted. *Id*. at 202.[17]

(Pl.'s Br. at 13 (original footnotes omitted; footnotes supplied).)

As set forth above, plaintiff was under the supervision of Standridge while she was a Benefits Analyst from 1993 to the Fall of 1998. (*Id*. at 2.)  Therefore, plaintiff's claims of disparate treatment based on incidents that occurred during her tenure as Benefit Analyst (incidents 1, 4, and 5) are time-barred and due to be dismissed.  Plaintiff also alleges that Standridge prepared her 1999 evaluation and, after she complained, Baguer revised the evaluation.  She testified that she received the first evaluation in May 1999.  Therefore, her claim of disparate treatment based on this incident is also time-barred and due to be dismissed.

The only alleged incident of disparate treatment that does not appear to be time-barred is plaintiff's claim that "everything" she did "had to go through" Standridge. (Doc. 37, Ex. 1 at 103.)  The court finds that this incident is not an actionable adverse employment action.

_____

[16]Bradley made this statement sometime between 1996 and 1998. (Doc. 37, Ex. 1 at 201-02.)

[17]Standridge made this statement sometime between 1996 and 1998. (Doc. 37, Ex. 1 at 202.)

15

Plaintiff must establish an actionable adverse employment action before a claim of employment discrimination may proceed. *See Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1246 (11th Cir. 2001) (Proof of an "adverse employment action is an indispensable element of a Title VII plaintiff's case."). For plaintiff to show an adverse or tangible employment action, she must establish that she has suffered "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). She must "show a *serious and material* change in the terms, conditions, or privileges of employment." *Davis*, 245 F.3d at 1239 (emphasis in original).

As noted above, plaintiff contends that "everything [she] did had to go through Mr. Standridge." (Pl.'s Br. at 13.) She does not allege any specific employment action, resulting from Standridge's continuing awareness of her work, that adversely affected the terms and conditions of her employment. (Doc. 37, Ex. 1 at 103-07.) When asked what Standridge was doing during this time, plaintiff testified that Standridge was "critical of anything and everything that [she] did." (*Id.* at 104.) However, mere criticism is not an actionable adverse employment action. *Mistretta v. Volusia County Dept. of Corrections*, 61 F. Supp. 2d 1255, 1260-61 (M.D. Fla. 1999)("Verbal reprimands and threats of termination do not constitute adverse employment actions." (citing *Benningfield v. City of Houston*, 157 F.3d 369, 377 (5th Cir. 1998); *Nunez v. City of Los Angeles*, 147 F.3d 867, 875 (9th Cir. 1998); *Mattern v.*

*Eastman Kodak Co.*, 104 F.3d 702, 708 (5th Cir.), *cert. denied*, 522 U.S. 932 (1997); *Smiley v. Jekyll Island State Park Authority*, 12 F. Supp. 2d 1377, 1382 (S.D. Ga.1998))).

Assuming as true that Standridge was informed of plaintiff's work performance after she became a Quality Assurance Analyst, having her work go through Standridge was not an adverse employment action that seriously and materially affected a term or condition of her employment. Therefore, defendant's Motion for Summary Judgment will be granted and plaintiff's claims of discrimination with regard to the terms and conditions of her employment will be dismissed.

### 3.     Termination

Plaintiff alleges that she was terminated on the basis of her race, her age, and her disabilities.  To establish a prima facie case of discrimination with regard to her termination, plaintiff must show that: (1) she is in a protected class; (2) she was qualified for the position held; (3) her employment was terminated; and (4) she was replaced with a person outside the protected class." *Walker v. Nationsbank of Fla.*, 53 F.3d 1548, 1556 (11th Cir. 1995). Alternatively, a plaintiff may establish a prima facie case by showing that she was treated less favorably than a similarly situated employee outside the protected class.  *Pearson v. Macon-Bibb County Hosp. Auth.*, 952 F.2d 1274, 1280 (11th Cir. 1992).

If plaintiff demonstrates a prima facie case, the burden shifts to the defendant to articulate a non-discriminatory reason for its challenged decision.  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997)(citing *and Texas Department of Community*

17

*Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981)).  If the defendant carries this burden of production, "the presumption of discrimination [created by plaintiff's prima facie showing] is eliminated, and the plaintiff must submit evidence showing that the articulated reason is pretextual.  If pretext is established, summary judgment in favor of the defendant is generally inappropriate." *Walker v. Prudential Property & Cas. Ins. Co.*, 286 F.3d 1270, 1274 (11th Cir. 2002)(citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000); *Chapman v. AI Transport*, 229 F.3d 1012, 1025 n. 11 (11th Cir. 2000); *Combs*, 106 F.3d at 1538).

Plaintiff may establish that an articulated reason is a pretext for unlawful discrimination "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Carter v. City of Miami*, 870 F.2d 578, 584 (11th Cir. 1989)(quoting *Goldstein v. Manhattan Industries*, 758 F.2d 1435, 1445 (11th Cir. 1985)(citing *Burdine*, 450 U.S. at 256)).  If a plaintiff chooses to establish pretext by showing that his employer's proffered reason is unworthy of credence, she must attack that reason "head on and rebut it." *Chapman*, 229 F.3d at 1030.  She must offer evidence that "casts sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" *Combs*, 106 F.3d at 1538 (race discrimination) (quoting *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)); *see also Wascura v. City of South Miami*, 257 F.3d 1238, 1247 (11th Cir. 2001)(disability

18

discrimination); *Damon v. Fleming Supermarkets Of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999)(age discrimination).

The "pretext analysis focuses on a narrow question:  Would the proffered evidence allow a reasonable factfinder to conclude that the articulated reason for the decision was not the real reason?" *Walker*, 286 F.3d at 1276 (citations omitted).

For purposes of deciding defendant's Motion for Summary Judgment, the court assumes that plaintiff can establish a prima facie case of unlawful discrimination with regard to her termination claims.  Nevertheless, the court finds that plaintiff has failed to produce sufficient evidence that defendant's articulated reason for her termination was a pretext for unlawful discrimination.

Defendant contends that plaintiff was terminated because of excessive sick leave in violation of its September 2000 written warning, which stated that she would be terminated "if she used more than one sick day a month."  Plaintiff was absent two days in October 2000 and defendant contends it terminated her for violation of the September written warning. Plaintiff argues that defendant's articulated reason for her termination was a pretext for unlawful discrimination.  She contends that she had a legitimate medical need to be absent two days in October and, even though defendant had warned plaintiff one month earlier that it would terminate her if she was absent two days in one month, defendant should have allowed her additional sick leave in October due to her legitimate medical needs.[18] (Pl.'s Br.

---

[18]As set forth above, plaintiff had exhausted her FMLA leave and she had refused defendant's offers of paid and unpaid medical leave.

at 14-15.)  In other words, plaintiff concedes that defendant terminated her for violating the September 2000 warning, while asserting that such termination was unfair under the circumstances.  This argument is not sufficient to establish that defendant's articulated reason for termination was a pretext for unlawful discrimination.  *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir.1991).

Therefore, because plaintiff cannot establish that defendant's articulated reason for her termination was a pretext for unlawful discrimination, defendant's motion for summary judgment as to plaintiff's discrimination claims based on her termination is to be granted and such claims will be dismissed.

### 4.     Hostile Work Environment

Plaintiff does not oppose summary judgment as to her age discrimination claim based on a hostile work environment.  Therefore, defendant's motion for summary judgment as to this claim is to be granted and that claim will be dismissed.  *See Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994).

## B.     RETALIATION

Plaintiff has voluntarily agreed to waive her age and disability retaliation claims.  (Pl.'s Br. at 23.)  Therefore, those claims will also be dismissed.  To the extent that plaintiff alleges a claim of retaliation based on her complaint of race discrimination, plaintiff has abandoned such claim.  *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995)("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

## C.  BREACH OF CONTRACT

Plaintiff contends, "Standridge told [plaintiff] that salaried employees, such as herself, did not get sick time as such, but that it was **'unlimited' as long as it was not abused**." (Doc. 1 ¶ 7; *see also* doc. 37, Ex. 1 at 119-20.)  She contends that this statement was a promise of "unlimited" sick leave, which was a "material condition" of her employment, and that her termination in November 2000 was a breach of this promise.

Under Alabama law, "to become a binding promise, the language used [by the employer] must be specific enough to constitute an actual offer rather than a mere general statement of policy." *Hoffman-La Roche, Inc. v. Campbell*, 512 So.2d 725, 734 (Ala. 1987); *see also Campisi v. Scoles Cadillac, Inc.*, 611 So.2d 296, 299-300 (Ala. 1992)("[T]he list of employee benefits in the handbook that Campisi maintains was 'specific and comprehensive' enough to constitute a specific offer of employment is nothing more than a statement of general policy, which is insufficient to create an offer for continued employment."); *Bell v. South Central Bell*, 564 So.2d 46, 48 (Ala. 1990)("[S]ome of the language contained in the Management Guide reveals that it was a general statement of SCB's policy toward alcoholism . . . . Because the language contained in the Management Guide . . . was merely a statement of policy, it could not meet the contractual requirement of an offer.").

Plaintiff contends that Standridge told her "that exempt employees did not accrue sick time," and that "they had unlimited sick time as long as it was not abused."  This statement was not an offer; it was a general statement of defendant's policy regarding sick leave for

21

exempt employees. As the court finds that Standridge's statement was not an offer to contract, plaintiff's claim for breach of contract will be dismissed.

Accordingly, defendant is entitled to summary judgment on plaintiff's breach of contract claim.

## D.    FRAUD CLAIM

Plaintiff asserts a claim of fraud against defendant based on defendant's representation that she had unlimited sick leave and that, in reliance on this statement, she took two sick days in October 2000, for which defendant terminated her. (Doc. 1 ¶¶ 49-51.) Defendant contends that plaintiff's fraud claim must fail because she cannot show that she reasonably relied on the allegedly false statement. The court agrees.[19]

Alabama law provides, "If a party has reason to doubt the truth of an oral representation or is informed of the truth before he acts, he may not reasonably act or rely on that representation." *Ramsay Health Care, Inc. v. Follmer*, 560 So.2d 746, 748 (Ala. 1990)(citing *Bedwell Lumber Company v. T & T Corp.*, 386 So.2d 413 (Ala.1980)). The undisputed evidence shows that plaintiff knew that the attendance policy had been revised, that sick leave for exempt employees was not unlimited, and that, before plaintiff took two days of sick leave in October 2000, she was informed that she would be terminated if she

---

[19]Defendant also contends that plaintiff cannot establish her fraud claim because she cannot demonstrate that the statement was false or that it was made with knowledge of its falsity or with reckless disregard for the truth. (Def.'s Br. at 27-28; Def.'s Reply Brief at 10.) Because the court finds that plaintiff cannot establish that she reasonably relied on the allegedly false statement, the court will not address the other grounds raised by defendant.

22

took more than one day of sick leave per month between October 2000 and March 2001. Indeed, plaintiff testified, "I was advised by [Baguer], I believe, that I had one sick day a month from October 2000 to my anniversary in March 2001, and if I took more than two sick days in a month, I would be terminated." (Doc. 37, Ex. 1 at 130.) Plaintiff also testified that Baguer told her that "any further absences would result in termination," and that she was terminated after she had two absences in October. (*Id.* at 136.)

Based on plaintiff's testimony that she was told she would be terminated if she was absent more than one day per month, she cannot, as a matter of law, have reasonably relied on defendant's prior statement that plaintiff, as an exempt employee, had unlimited absences. Therefore, defendant's motion for summary judgment as to plaintiff's fraud claim will be granted.

## IV.  CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendant Blue Cross Blue Shield of Alabama is entitled to judgment as a matter of law on all claims. An order granting defendant's motion for summary judgment will be entered contemporaneously with this Memorandum Opinion.

DONE this ___8th___ day of March, 2003.

Sharon Lovelace Blackburn

**SHARON LOVELACE BLACKBURN**
United States District Judge

23